**ALMEIDA LAW GROUP**
Victor J. Sandoval (Cal. Bar #344461)
111 W Ocean Boulevard, Suite 426
Long Beach, CA 90802
T: 562-534-5907
victor@almeidalawgroup.com

[additional counsel listed below]

*Attorneys for Plaintiff & the Proposed Classes*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

JOSHUA MONTGOMERY, *individually and on behalf of himself and all others similarly situated,*

Plaintiff,

v.

HRB TAX GROUP, INC., and H&R BLOCK, INC., PATHWARD, N.A., and EMERALD FINANCIAL SERVICES, LLC,

Defendants.

Case No.: '26CV0759 LL MSB

**CLASS ACTION COMPLAINT**

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR VIOLATIONS OF:

1. THE MILITARY LENDING ACT, 10 U.S.C. § 987, *et seq.* – EXCESSIVE FEES
2. THE MILITARY LENDING ACT, 10 U.S.C. §987, *et seq.* – UNLAWFUL WAIVER

**JURY TRIAL DEMANDED**

Plaintiff Joshua Montgomery, a Chief Petty Officer in the U.S. Navy ("Plaintiff" or "CPO Montgomery") and a California citizen, on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and good faith belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against HRB Tax Group, Inc., H&R Block, Inc., Pathward, N.A. and Emerald Financial Services, LLC, (collectively, "H&R Block" and/or "Defendants"):

## NATURE OF THE ACTION

1. The Military Lending Act, 10 U.S.C. § 987, *et seq*. ("MLA"), was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory or unlawful lending practices. Such practices endanger our nation's military readiness and are detrimental to service member retention, morale, household stability, security clearances, and career advancement.

2. This Complaint seeks to protect active-duty military service members from H&R Block's unlawful lending practices which violate the MLA.

3. H&R Block is a leading provider of tax return preparation and electronic filing services nationwide. Plaintiff used H&R Block's services to prepare and file his tax returns in 2020, 2021, 2022, 2023, and 2024.

4. Defendants are in the business of tax refund advance lending through their H&R Block Refund Advance Loan ("Refund Advance Loan") product—it is a short-term, high-speed loan offered by Defendants, allowing taxpayers to receive a portion of their anticipated federal refund shortly after filing their return, often the same day.

5. These loans are repaid by a covered borrower's expected refund when the tax refund is received.

6. Defendants' Refund Advance product is inseparable from a web of required ancillary financial accounts that generate revenue despite Defendants' marketing of the loan itself as "no-fee" and "0% APR."

7. To receive a Refund Advance Loan, consumers must open and maintain an H&R Block Emerald Prepaid Mastercard account (i) issued by MetaBank, N.A., now known as Pathward, N.A., and (ii) managed by Emerald Financial Services, LLC, into which loan proceeds are deposited.

8. While Defendants represent the Refund Advance Loan carries no interest or loan fees, repayment is structured through temporary deposit accounts—a "Refund Account"—over which Defendants and their banking partner exercise exclusive control.

9. Defendants also offer a short-term payday-style advance loan called the "Emerald Advance Loan," again through Pathward, N.A. and Emerald Financial Services, LLC.

10. Defendants advertise the Emerald Advance Loan as a fixed-rate short-term loan ranging from $350 to $1,500.

11. Although the loan is marketed as having "only" a 35.9% APR, this does not take into account added fees and charges, which increase the Military Annual Percentage Rate ("MAPR") of the loans.

12. In actuality, consumers who utilize these accounts incur fees that are functionally tied to the Refund Advance Loan and Emerald Advance Loan.

13. For example, consumers who elect or are steered into a Refund Transfer—often presented as part of the same refund-based transaction—are charged a $39 Refund Transfer fee, plus an additional $25 check disbursement fee if funds are issued by check.

14. Additional fees may be incurred depending on how the Emerald Card account is used, as governed by the Cardholder Agreement.

15. The required account structure enables Defendants to extract value through mandatory banking products and associated fees that reduce the consumer's tax refund. These costs are not incidental; they are integral to the Refund Advance Loan program and disproportionately impact service members and/or their spouses or dependents living paycheck to paycheck, rendering the product far more expensive than Defendants' marketing suggests.

16. Thus, although Defendants advertise the Refund Advance Loan as a "0% APR" loan, the product's structure and required ancillary services cause the MAPR to far exceed the MLA's 36% cap for Covered Borrowers, including active-duty service members and their dependents.

17. The MLA prohibits creditors from extending consumer credit to covered borrowers at a MAPR greater than 36%, calculated to include not only interest, but also fees and charges imposed directly or indirectly as a condition of the extension of credit. *See* 10 U.S.C. § 987, *et seq*.

18. Critically, the MAPR expressly includes application fees, participation fees, fees for ancillary products required to obtain credit, and fees imposed in connection with a transaction for consumer credit.

19. Thus, Defendants' reliance on a nominal "0% APR" is legally irrelevant if the economic cost of credit, properly calculated, exceeds the MLA's statutory ceiling.

20. Plaintiff, a Chief Petty Officer in the U.S. Navy, has used Defendants' tax services and, at relevant times, has obtained a Refund Advance Loan and an Emerald Advance Loan.

21. By virtue of the unlawful arbitration agreement within each loan's relevant terms, as well as fees charged, Defendants extended consumer credit to Plaintiff on numerous occasions in violation of the MLA.

22. Defendants agree that its products constitute a loan.

23. At a minimum, on the first page of the "Refund Advance Loan Disclosures," it is clearly stated, in bold, "**A Refund Advance Loan is a loan; it is not a tax refund.**"

24. As tax refund advance loans have become more popular, the parallels to payday lending are striking.

25. Like payday loans, Defendants' products trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue. Considering the substance of the transactions, including that Plaintiff used the funds obtained for personal or household use, Defendants' transactions constitute consumer credit.

26. In violation of the MLA, Defendants' products charge a MAPR well in excess of the MLA's legal limit.

27. Defendants' loans violate the MLA in at least six ways: by (i) charging interest above the 36% statutory MAPR cap; (ii) failing to provide credit disclosures required by the MLA; (iii) including purported class action ban and waiver of jury trial; (iv) including a mandatory binding arbitration clause; (v) including unreasonable notice from borrowers as a condition for legal action, and (vi) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(1), (2), (4), (5), (6).

28. Among the abusive lending practices that the MLA was designed to curb was predatory loans made to service members.[1]

29. In a Department of Defense ("DoD") report on lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the lending industry were highlighted.[2]

---

[1] Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.

[2] *Id.* at 10–16.

30. The Report noted that lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3]

31. Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing service members over $80 million in abusive fees annually as of 2005."[4]

32. Defendants' business practices violate the MLA and are part of a systematic nationwide policy and practice.

33. CPO Montgomery seeks to hold Defendants accountable for their actions and prevent their predatory lending practices from continuing.

## THE PARTIES

34. Plaintiff, Chief Petty Officer Joshua Montgomery, is an individual over 18 years of age.

35. At all relevant times, CPO Montgomery was a natural person resident of Naval Information Warfare Center Pacific in San Diego, California.

36. CPO Montgomery has been a member of the U.S. Navy for over 17 years. During the class period, CPO Montgomery was a Covered Member as that term is defined by the MLA as he is an active-duty service member employed by the United States Navy.

37. Defendant H&R Block, Inc. is a Kansas corporation with its headquarters at 1301 Main Street in Kansas City, Missouri 64105.

38. Defendant HRB Tax Group, Inc. is a Missouri Corporation that is registered to do business in the State of California. Defendant HRB Tax Group, Inc.'s

---

[3] *Id.* at 10–11.

[4] *Id.* at 11.

principal place of business is in Missouri, and this Defendant may be served at 330 North Brand Boulevard in Glendale, California.

39. Defendant HRB Tax Group, Inc. has offered loan agreements to consumers, including Covered Members, during the relevant time period.

40. Defendant HRB Tax Group, Inc. is a subsidiary of H&R Block, Inc.

41. Defendant Pathward, N.A. is a federally chartered national banking association located at 5501 South Broadband Lane in Sioux Falls, South Dakota 57108.

42. Defendant Emerald Financial Services, LLC is a Delaware limited liability company, with a principal place of business at 1301 Main Street in Kansas City, Missouri 64105.

43. Defendants have acted in concert and are jointly and severally liable for their concerted and collective violations of the MLA.

## JURISDICTION AND VENUE

44. This Court has jurisdiction over Defendants, because they, at all times relevant herein, regularly conducted business the State of California, including providing tax preparation services in California and making loans or servicing loans to service members in California.

45. Venue is proper in this District because Defendants coordinated business operations in California, did business in California and in this District, and committed the wrongful lending practices alleged herein in this District. Additionally, Plaintiff interacted with Defendants' products in San Diego County, and was forced to agree to arbitration, in violation of the MLA, while physically located in San Diego County.

## FACTUAL BACKGROUND

### A. The MLA was Designed to Protect Covered Members.

46. The Department of Defense's Report on lending practices discussed the payday lending industry at length.[5]

[5] Report, *supra*, n.1.

47. The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

48. Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing service members millions in abusive fees.[7]

49. Moreover, the military payment architecture, and the Uniform Code of Military Justice to which service members are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

50. While the precise tax refund advance product offering was developed somewhat recently, its genre of high interest loan is not new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers,

---

[6] *Id.* at 10–11.

[7] Id. at 11.

[8] *Id.* at 14. To be sure, Refund Advance Loan providers like Defendants do not collect physical checks from their customers at loan initiation but instead takes a virtual check by requiring Covered Members to authorize automatic debits from their tax refunds to repay their loans.

payday loans, and 'military loans' via the Internet."[9] Those loans, like Defendants' loans, "are delivered and collected online through electronic fund transfer."[10]

51. The Report noted key similarities between the various predatory lending products that accurately encapsulate Defendants' business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) … Increasingly the Internet is used to promote loans to service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state

[9] *Id.* at 15.

[10] *Id.* at 16.

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id*. at 44.

statutes or by developing schemes designed to circumvent existing laws.[12]

52. The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13]

53. As if being trapped in a debt cycle is not bad enough, some service member victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

54. Drawing from the bountiful evidence of service member abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

55. To curb usurious interest rates, excessive annual percentage rates ("APRs"), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

56. The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming service members. The legislation requested was supported by the

---

[12] *Id.* at 21- 22

[13] *Id.* at 39.

[14] *Id.* at 41–42.

[15] *Id.* at 46.

[16] Specifically, the DoD requested legislation protecting service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

DoD, military and veterans' organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

57. Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

## B. The Military Lending Act

58. In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq*. was enacted.

59. The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

60. The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);
- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and
- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

61. Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

62. The MLA also makes it unlawful to use a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987(e).

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

### C. Tax Refund Advance Loans

63. Defendants market and facilitate short-term, refund-based consumer loans known as the H&R Block Refund Advance Loan (the "Refund Advance Loan"), which are originated by Pathward, N. A. and managed by Emerald Financial Services, LLC and offered in connection with tax preparation services by H&R Block online and at offices nationwide.

64. The Refund Advance Loan is marketed as a "no interest" or "0% APR" product and is targeted at consumers seeking immediate access to funds prior to receipt of their anticipated federal tax refunds.

65. Many consumers who obtain Refund Advance Loans, including Plaintiff and similarly situated class members, are covered borrowers within the meaning of the MLA, 10 U.S.C. § 987, including active-duty service members and/or their dependents.

66. As a condition of receiving a Refund Advance Loan, consumers must authorize the routing of their federal tax refunds through accounts controlled by Defendants for repayment of the loan, and once the tax return is filed, the direction of the refund is irrevocable.

67. Consumers who obtain a Refund Advance Loan are required to receive loan proceeds through a Pathward-issued account, including prepaid debit cards or refund transfer accounts controlled by Pathward (the "Required Accounts").

68. The Required Accounts are governed by separate account agreements that impose numerous fees, including but not limited to:

- ATM withdrawal fees;
- Expedited funding fees;
- Cash reload fees;
- Inactivity fees; and
- Other transaction-based charges

69. These fees are deducted directly from consumers' funds and refunds, reducing the amount of money ultimately received by the borrower.

70. Although Defendants label the Refund Advance Loan as carrying "0% interest," the Military Lending Act requires calculation of the MAPR, which includes not only stated interest, but also fees and charges imposed directly or indirectly as a condition of the extension of credit.

71. The fees imposed through the Required Accounts are incurred incident to and as a practical condition of receiving the Refund Advance Loan and therefore must be included in the MAPR under the MLA.

72. In practice, consumers who receive a Refund Advance Loan are routinely charged: a $39 Refund Transfer fee, and an additional $25 check disbursement fee if proceeds are issued by check.

73. These fees are deducted directly from the consumers' tax refund before any remaining funds are made available, and they are incurred in connection with—and often as a practical condition of—receiving the Refund Advance Loan.

74. When these fees are annualized over the short duration of the Refund Advance Loan—often lasting only days or weeks—the effective MAPR far exceeds the MLA's 36% statutory cap, particularly for lower-dollar advances.

75. For example, for a loan of $500 and a term of about 14 days (typical IRS refund timing for e-filed returns disclosed by Defendant), and given the associated fees of $39 (refund transfer), $25 (check disbursement fee), which is a total of $64 in fees incident to the extension of credit, the resulting MAPR is 333.7%.

**MAPR Formula (MLA)**

$$\text{MAPR} = \left(\frac{\text{Total Fees}}{\text{Loan Amount}}\right) \times \left(\frac{365}{\text{Loan Term (days)}}\right) \times 100$$

**MAPR Calculation – $500 Loan**

$$\left(\frac{64}{500}\right) \times \left(\frac{365}{14}\right) \times 100$$

$$= 0.128 \times 26.07 \times 100$$

$$= \mathbf{333.7\%\ MAPR}$$

| Loan Amount | Fees | Days | MAPR |
|---|---|---|---|
| 250 | $ 64.00 | 14 | 667.40% |
| 400 | $ 64.00 | 14 | 417.10% |
| 750 | $ 64.00 | 14 | 222.50% |

76. Smaller loans would have an even higher MAPR:

| **Loan Amount** | **Fees** | **Days** | **MAPR** |
|---|---|---|---|
| $250 | $64 | 14 | **667.4%** |
| $400 | $64 | 14 | **417.1%** |
| $750 | $64 | 14 | **222.5%** |

77. As a result, Defendants extended consumer credit to covered borrowers at an unlawful MAPR in violation of 10 U.S.C. § 987(b).

78. In connection with applying for and receiving Refund Advance Loans, consumers are required to sign agreements containing mandatory arbitration provisions,

which purport to require binding individual arbitration and waive the right to participate in class or representative actions.

79. The Military Lending Act expressly prohibits creditors from requiring covered borrowers to submit to arbitration or waive their rights to seek relief in court as a condition of consumer credit. 10 U.S.C. § 987(e)(3).

80. Additionally, the MLA expressly prohibits a creditor from demanding unreasonable notice from a borrower as a condition for legal action. 10 U.S.C. § 987(e)(4).

81. Defendants' inclusion and enforcement of arbitration provisions in connection with Refund Advance Loans issued to covered borrowers violates the MLA and renders those provisions void and unenforceable as to covered borrowers.

**D. Emerald Advance Loans**

82. Beginning no later than the 2023 tax year, Defendants introduced and marketed a separate short-term credit product known as the H&R Block Emerald Advance Loan (the "Emerald Advance Loan").

83. The Emerald Advance Loan is originated by Pathward, N.A. and managed by Emerald Financial Services, LLC and is offered in connection with tax preparation services at H&R Block offices.

84. Unlike Refund Advance Loans, the Emerald Advance Loan is not promoted as a "no interest" product. Instead, the loan carries a stated annual percentage rate of approximately 35.9%.

85. As a condition of receiving an Emerald Advance Loan, consumers are required to receive loan proceeds through either an H&R Block Emerald Prepaid Mastercard® or a Spruce Spending Account, both issued and controlled by Pathward (the "Required Accounts").

86. Like the Refund Advance Loan, the account agreements impose numerous fees, including but not limited to:

- ATM withdrawal fees;
- Expedited funding fees;
- Cash reload fees;
- Inactivity fees; and
- Other transaction-based charges.

87. These fees are deducted directly from consumers' funds and are incurred incident to and as a practical condition of receiving the Emerald Advance Loan, because consumers cannot access loan proceeds or complete repayment without the Required Accounts.

88. As stated above, under the MLA, the MAPR must include not only stated interest, but also all fees and charges imposed directly or indirectly as a condition of the extension of credit. 10 U.S.C. § 987(i)(3).

89. Although the Emerald Advance Loan's stated APR is approximately 35.9%, the additional fees imposed through the Required Accounts must be included in the MAPR calculation under the MLA.

90. When these required fees are included, the effective MAPR exceeds the MLA's 36% statutory cap, rendering the Emerald Advance Loan unlawful when issued to covered borrowers.

91. In connection with applying for and receiving an Emerald Advance Loan, consumers are required to electronically sign multiple agreements containing mandatory arbitration provisions.

92. These agreements require consumers to resolve disputes through binding individual arbitration, waive the right to a jury trial, and waive the right to participate in class or representative actions.

93. The arbitration provisions purport to apply broadly to disputes involving the Emerald Advance Loan and related accounts and are presented as part of a take-it-or-leave-it transaction required to access the loan proceeds.

94. The Military Lending Act expressly prohibits creditors from requiring covered borrowers to submit to arbitration or waive their rights to seek relief in court as a condition of consumer credit. *See* 10 U.S.C. § 987(e)(3).

95. Accordingly, Defendants' inclusion of arbitration and other prohibited provisions in connection with Emerald Advance Loans issued to covered borrowers violates the MLA and renders those agreements void and unenforceable as to covered borrowers.

96. Defendants' practices described herein are standardized and uniformly applied to all consumers who apply for and receive Emerald Advance Loans.

97. Defendants knew or should have known that: the Required Account fees would be incurred by borrowers in connection with the loan; those fees would cause the MAPR to exceed the MLA's statutory cap; and the inclusion of arbitration provisions violated the express protections afforded to service members under federal law.

**REPRESENTATIVE PLAINTIFF'S SPECIFIC ALLEGATIONS**

98. Plaintiff, as a Chief Petty Officer in the United States Navy is a covered borrower within the meaning of the Military Lending Act, 10 U.S.C. § 987, at all times relevant to this action.

99. In or around the 2020 tax filing season (i.e., early 2021), Plaintiff used H&R Block's tax filing services.

100. In or around February 2021, Plaintiff agreed to take a Refund Advance Loan.

101. Plaintiff completed standardized paperwork in the process to obtain the Tax Year 2020 Refund Advance Loan (the "2020 Refund Advance Loan").

102. In connection with repayment of the 2020 Refund Advance Loan, upon information and belief, Plaintiff incurred the following fees, which were deducted directly from his tax refund before he received any remaining funds:

- a Refund Transfer fee of $39; and

- a check disbursement fee of $25.

103. Upon information and belief, the Refund-Based Fees totaled $64 and were incurred incident to and as a direct result of Plaintiff obtaining and repaying the 2020 Refund Advance Loan.

104. Defendants represented that the 2020 Refund Advance Loan carried 0% interest, and $0 in fees.

**NOTICE**

- The Refund Advance is a loan, and is not your actual income tax refund.

**Fee Schedule**

| Refund Advance Amount | Total Refund Advance Fees | Annual Percentage Rate |
|---|---|---|
| $250 | $0 | 0% |
| $500 | $0 | 0% |
| $750 | $0 | 0% |
| $1,250 | $0 | 0% |
| $3,500 | $0 | 0% |

(Excerpt of California Refund Advance Loan Disclosure)

105. When the Refund-Based Fees incurred by Plaintiff are included in the MAPR calculation, Plaintiff's 2020 Refund Advance Loan carried an effective MAPR calculated as follows:

$$\text{MAPR} = \left(\frac{64}{500}\right) \times \left(\frac{365}{14}\right) \times 100 = \mathbf{333.7\%}$$

106. Plaintiff's 2020 Refund Advance Loan therefore carried a MAPR of approximately 333.7%, which exceeds the MLA's statutory maximum of 36% by nearly ten times.[18]

18 In fact, incurring either the Refund Transfer Fee or the Check Disbursement Fee violates the MAPR ceiling, as those fees calculate to 203.4% and 130.4%, respectively.

107. In December 2023, Plaintiff entered into an agreement for an Emerald Advance Loan (the "2023 Emerald Advance Loan") which was due to be paid in full by March 2024.

108. The 2023 Emerald Advance Loan had a stated interest rate of 35.9%. However, the MLA requires calculation of the MAPR, which includes fees imposed directly or indirectly as a condition of the extension of consumer credit.

109. The principal amount of the 2023 Emerald Advance Loan was $1,300.

110. In or around November 2024, Plaintiff applied for and received an Emerald Advance Loan (the "2025 Emerald Advance Loan") in the principal amount of $650, offered in connection with tax preparation services provided by H&R Block, originated by Pathward, N. A., and managed by Emerald Financial Services, LLC, which was due to be paid in full by March 2025.

111. As a condition of receiving the stated Loans, Plaintiff was required to receive the loan proceeds through an H&R Block Emerald Prepaid Mastercard® or similar Pathward-issued account.

112. Upon information and belief, for his 2024 Emerald Advance Loan, Plaintiff incurred ATM withdrawal fees ($3.50), ATM balance inquiry fees ($1.00) and inactivity fees ($9.95), meaning his actual MAPR was:

$$\left(\frac{165.33}{1300}\right) \times \left(\frac{365}{118}\right) \times 100 = \mathbf{39.3386\%}$$

113. Upon information and belief, for his 2025 Emerald Advance Loan, Plaintiff incurred ATM withdrawal fees ($3.50), ATM balance inquiry fees ($1.00) and inactivity fees ($9.95), meaning his actual MAPR was:

$$\left(\frac{109.71}{650}\right) \times \left(\frac{365}{150}\right) \times 100 = \mathbf{41.0709\%}$$

114. In addition to the excessive MAPRs, Plaintiff was required to electronically sign agreements containing mandatory arbitration provisions in connection with applying for and receiving the Emerald Advance Loans and Refund Advance Loan.

115. The inclusion of mandatory arbitration provisions in connection with the Loans violated the MLA's prohibition on requiring covered borrowers to submit to arbitration, waive their right to seek relief in court, and impose onerous notice requirements on servicemembers seeking to bring legal claims.

## TOLLING OF THE STATUTE OF LIMITATIONS

116. The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to CPO Montgomery, until their active-duty service concludes.

117. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## CLASS ACTION ALLEGATIONS

118. CPO Montgomery brings this action on behalf of himself and all other persons similarly situated. The proposed "MLA Excessive Fee Class" and the "MLA Waiver of Rights Class" (collectively, the "Classes") are defined as follows:

**MLA Excessive Fee Class:** All Covered Members who entered into an agreement with Defendants to use an Emerald Refund Loan or a substantially similar product which Defendant charged a finance charge, including, without limitation, a refund transfer fee or check disbursement fee.

**MLA Waiver of Rights Class:** All Covered Members who entered into an agreement with Defendants that included an arbitration agreement, a class waiver agreement, a waiver of the right to a jury trial, or otherwise imposed onerous legal notice provisions in the case of a dispute.

119. Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Defendants and any entity in which Defendant has a controlling interest, or which has a controlling interest in any of Defendants, and their legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

120. CPO Montgomery reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

**Numerosity and Ascertainability**

121. Plaintiff is unable to state the precise number of members of the Classes because such information is in the exclusive control of Defendants.

122. However, upon information and belief and the investigation of counsel, Plaintiff believes the proposed Classes each contain members so numerous that separate joinder of each member of the respective Class is impractical. There are tens or hundreds of thousands of Class Members for the MLA Excessive Fee Class and the MLA Waiver of Rights Class, respectively.

123. Defendants' scheme has harmed and continues to harm the members of the Classes.

124. The identities of all Class members are readily ascertainable from the Defendants' business records.

125. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

**Commonality**

126. There are common questions of law and fact affecting the rights of each Class Member and common relief by way of damages. The harm that Defendants have caused is substantially uniform with respect to Class Members. Common questions of law and fact that affect the Class Members include, but are not limited to:

a. Whether CPO Montgomery, the MLA Excessive Fee Class Members, and the MLA Waiver of Rights Class Members are Covered Members subject to the protections of the MLA;
b. Whether Defendants are "creditors" subject to the requirements and limitations of the MLA;
c. Whether Defendants' loan products constitute an extension of "consumer credit" subject to the protections and limitations of the MLA;
d. Whether Defendants entered into standard form loan agreements with Covered Members;
e. Whether Defendants' loans exceed the MLA's statutory rate cap of 36% MAPR;
f. Whether Defendants failed to provide required credit disclosures in violation of the MLA;
g. Whether Defendants' standard form loan agreements contain a class action waiver provision, jury trial waiver provision, or onerous legal provisions in violation of the MLA;
h. Whether Defendants' standard form loan agreements contain an arbitration clause in violation of the MLA;

i. Whether CPO Montgomery, the MLA Excessive Fee Class Members, and the MLA Waiver of Rights Class Members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

j. Whether Defendants should be enjoined from continuing their lending practices in the manner challenged herein;

k. Whether Defendants are subject to punitive damages, and, if so, the proper measure of such damages and remedies to which CPO Montgomery, the MLA Excessive Fee Class Members, and the MLA Waiver of Rights Class Members are entitled under 10 U.S.C. § 987(f)(5); and

l. Whether CPO Montgomery, the MLA Excessive Fee Class Members, and the MLA Waiver of Rights Class Members are entitled to any other declaratory and/or injunctive relief.

**Typicality**

127. The claims and defenses of CPO Montgomery are typical of the claims and defenses of the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members because CPO Montgomery is a Covered Member and loan agreements with Defendants are typical of the type of personal, household, or family loans that Defendants normally and routinely provide to Covered Members.

128. Additionally, Defendants use the same or substantially similar standard form loan agreements in all of their lending transactions. While versions may change from year to year, Defendants use substantially similar form documents with all borrowers. The documents involved relevant transactions were standard form documents and the violations are statutory in nature.

129. CPO Montgomery suffered damages of the same type and in the same manner as the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members.

130. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members.

**Adequate Representation**

131. CPO Montgomery is an adequate class representative because his interests do not conflict with the interests of the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members, and he will adequately and fairly protect the interests of the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members.

132. CPO Montgomery intends to prosecute this action vigorously and has taken actions before filing this Complaint by hiring skilled and experienced counsel. There is no conflict between CPO Montgomery and the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members.

133. Plaintiff's counsel are adequate counsel, are experienced in class action litigation in state and federal courts across the United States and have particular skill in litigating statutory claims under state and federal law. Additionally, attorney Domenica Russo, who will seek admission *pro hac vice* is a veteran, having served the United States as a member of the Army and Army Reserves.

134. Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

135. The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members are so numerous as to make joinder impracticable. However, the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the MLA Excessive Fee Class and the MLA Waiver of Rights Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct;
- Adjudications with respect to individual members of the MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and
- The claims of the individual MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members are small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in which MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members can, as a practical matter, recover for the harms caused by Defendants.

136. Given the above, the proposed MLA Excessive Fee Class and the MLA Waiver of Rights Class both fulfill the certification criteria of Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).

## FIRST CAUSE OF ACTION – EXCESSIVE INTEREST AND FEES

**Violations of the Military Lending Act 10 U.S.C. § 987, *et seq*.**

***(On Behalf of Plaintiff and the MLA Class Excessive Fee Class)***

137. Plaintiff realleges and incorporates by reference herein the allegations set forth in the above paragraphs.

138. The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

139. A "Covered Member" includes, as relevant here, "a member of the armed forces who is serving on[ a]ctive duty . . . under a call or order that does not specify a period of 30 days or fewer[.]" 32 C.F.R. § 232.3(g).

140. "The MAPR is the cost of the consumer credit expressed as an annual rate[.]" 32 C.F.R. § 232.3.

141. The MAPR includes, as relevant here, "[f]inance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit[.]" 32 C.F.R. § 232.4.

142. CPO Montgomery and the MLA Excessive Fee Class Members are "Covered Members" and are therefore afforded the protections granted by the MLA.

143. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

144. CPO Montgomery is considered a "Covered Member" with respect to his loans because CPO Montgomery is an active duty service member who is obligated by law to repay loans he took out for personal, family, or household purposes.

145. Defendants are "creditors" subject to the requirements and limitations imposed by the MLA in that Defendants engage in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); 32 C.F.R. § 232.3(i).

146. Defendants charged CPO Montgomery and the MLA Excessive Fee Class an amount above the 36% interest rate cap on their loans, in violation of the MLA.

147. Upon information and belief, Defendants failed to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

148. As a result, Defendants have violated, and continue to violate, the Military Lending Act, 10 U.S.C. § 987.

149. Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of himself and the MLA Excessive Fee Class, CPO Montgomery seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5).

150. Further, Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

## SECOND CAUSE OF ACTION – WAIVER OF RIGHTS

**Violations of the Military Lending Act 10 U.S.C. § 987, *et seq*.**

***(On Behalf of Plaintiff and the MLA Waiver of Rights Class)***

151. Plaintiff realleges and incorporates by reference herein the allegations set forth in the above paragraphs.

152. A "Covered Member" includes, as relevant here, "a member of the armed forces who is serving on[ a]ctive duty . . . under a call or order that does not specify a period of 30 days or fewer[.]" 32 C.F.R. § 232.3(g).

153. CPO Montgomery and the MLA Waiver of Rights Class Members are "Covered Members" and are therefore afforded the protections granted by the MLA.

154. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

155. CPO Montgomery is considered a "Covered Member" with respect to his loans because CPO Montgomery is an active-duty service member who is obligated by law to repay loans he took out for personal, family, or household purposes.

156. Defendants are "creditors" subject to the requirements and limitations imposed by the MLA in that Defendants engage in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); 32 C.F.R. § 232.3(i).

157. The MLA prohibits creditors from attempting to secure the waiver of various rights. 10 U.S.C. § 987(e).

158. Defendants' standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

159. Defendants' standard form loan agreements include class action waivers and jury trial waivers in violation of 10 U.S.C. § 987(e)(3).

160. Defendants' standard form loan agreements include a demand for unreasonable notice from borrowers as a condition for legal action. 10 U.S.C. § 987(e)(4)

161. Defendant uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for the Refund Advance obligations.

162. As a result, Defendants have violated, and continue to violate, the Military Lending Act, 10 U.S.C. § 987.

163. Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of himself and the MLA Waiver of Rights Class, CPO Montgomery seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5).

164. Further, Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Classes demands a jury trial on all issues and Counts so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, on behalf of the MLA Excessive Fee Class and the MLA Waiver of Rights Class, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against Defendants and in favor of Plaintiff and the Classes on all counts;

c. That the Court find and declare that CPO Montgomery MLA Excessive Fee Class Members' and the MLA Waiver of Rights Class Members' standard form loan agreements violate the MLA;

d. That the Court find and declare that Defendants violated the MLA and award CPO Montgomery and MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award CPO Montgomery and MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. An order awarding CPO Montgomery and MLA Excessive Fee Class Members and the MLA Waiver of Rights Class Members actual, statutory, and all other damages available by law, with pre- and post-judgment interest;

g. An order preventing Defendants from attempting to collect on any loans that violated the MLA from Plaintiff and the Class members;

h. That the Court enjoin Defendants from continuing to engage in unlawful lending practices in violation of the MLA;

i. That Defendants be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that Defendants be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

j. That the Court award reasonable attorneys' fees as provided by applicable law, including under the MLA, and/or applicable statutes or code of civil procedure;

k. That the Court award all costs of suit; and

l. That the Court award such other and further relief as the Court may deem just and proper.

DATED: February 6, 2026

Respectfully submitted,

**ALMEIDA LAW GROUP**

By: *<u>/s/ Victor J. Sandoval</u>*
Victor J. Sandoval (Cal. Bar #344461)
111 W Ocean Boulevard, Suite 426
Long Beach, CA 90802
T: 562-534-5907
E: victor@almeidalawgroup.com

David S. Almeida*
849 W. Webster Ave.
Chicago, IL 60614
T: 708-437-6476
E: david@almeidalawgroup.com

**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**

Brandon M. Wise*
Domenica M. Russo*

One US Bank Plaza, Suite 1950
St. Louis, MO 63101
T: 314-833-4827
E: bwise@peifferwolf.com
E: drusso@peifferwolf.com

*to seek admission *pro hac vice*

*Attorneys for CPO Montgomery and the Proposed Classes*